IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LNV CORP.,

    *Plaintiff,*

    v.

HARRISON FAMILY BUSINESS,
LLC, *et al.*

    *Defendants.*

Civil Action No.: ELH-14-03778

**MEMORANDUM OPINION**

On December 3, 2014, LNV Corporation ("LNV"), successor in interest to the Bank of

Eastern Shore ("BOES"), filed suit against Harrison Family Business, LLC ("HFB"), alleging

default on two commercial loans totaling $2,700,000.  ECF 17, Amended Complaint.[1]  HFB had

obtained the loans from BOES in February 2010.  *Id.*  Each loan is secured by a Deed of Trust to

real property and a Preferred Ship Mortgage on the vessel "Captain Buddy."  *Id.* at 3-7.  LNV

also named as defendants the guarantors of the loans: Harrison's Country Inn and Sport Fishing

Center, Inc. ("HCI"); Levin F. Harrison, IV ("Harrison IV" or "Mr. Harrison"); Leslie A.

Harrison; the Estate of Levin F. Harrison, III ("Harrison III"); and the Estate of Roberta L.

Harrison.  *Id.*  Harrison III and Roberta Harrison are the deceased parents of Harrison IV.  Leslie

Harrison is the wife of Harrison IV.

Plaintiff appended numerous exhibits to the suit.  Contemporaneous with the filing of

suit, LNV also filed a Motion for Appointment of a Receiver and Injunctive Relief ("Receiver

---

[1] LNV is incorporated in Nevada and has its principal place of business in Texas.  ECF
17 at 3, Amended Complaint.  Jurisdiction is founded on diversity of citizenship.  *See* 28 U.S.C.
§ 1332.

Motion," ECF 3), supported by a memorandum of law ("Receiver Memo," ECF 3-1) (collectively, "Receiver Motion" or "Motion").  In the Receiver Motion, LNV seeks appointment of a receiver as to HFB and Captain Buddy.[2]

LNV's amended complaint, filed on January 8, 2015 (ECF 17, Amended Complaint), contains six counts.  Counts I and II allege that HFB breached both loan agreements by "failing to make payments," and each count seeks a confessed judgment against HFB.  *Id.* at 10-11. Counts III and IV allege breach of contract by the guarantors as to each loan.  Count V seeks the appointment of a receiver for HFB and Captain Buddy.  *Id.* at 16-17.  Count VI seeks injunctive relief against HFB and its members, directing them, *inter alia*, to transfer funds to the receiver and to cooperate with the receiver, and to enjoin them from transferring assets and revenue of HFB without the receiver's consent.  *Id.* at 17-19.

The Amended Complaint also explains that the Maryland Commissioner of Financial Regulation closed BOES in 2012, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as Receiver.  ECF 17 ¶ 33, Amended Complaint.  In August 2014, the FDIC, as Receiver for BOES, assigned to LNV its interest in the loans to HFB, effective May 2014.  *See* ECF 17-13, Assignment of Deed of Trust for HFB Term Loan; ECF 17-14, Assignment of Deed of Trust for HFB Revolving Loan; LNV Exhibit D, Assignment of Assignment of Rents and Leases; LNV Exhibit E, Assignment of Assignment of Rents and Leases.[3]  ECF 1 at 2, Complaint.

---

[2] The Court deferred consideration of the Receiver Motion (ECF 3), while the parties pursued settlement.  *See* Order of Reference to United States Magistrate Judge dated January 15, 2015 (ECF 30).  When settlement was not achieved, the Court proceeded to consider the Receiver Motion.

[3] At the Motion hearing held on September 3, 2015, LNV introduced into evidence various exhibits, some of which are also available on ECF.  LNV Exhibits D through M are not docketed on ECF, however.  Where possible, I will cite to ECF.

Defendants oppose the appointment of a receiver for HFB and Captain Buddy.  *See* ECF 8 ("Opposition"); ECF 8-1, supporting memorandum ("Opposition Memo") (collectively, "Opposition").  LNV has replied.  ECF 20 ("Reply").

The Receiver Motion has been fully briefed.  In addition, evidence was presented and the Court heard oral argument at a hearing held on September 3, 2015.  For the reasons that follow, I will grant the Receiver Motion in part and deny it in part.

## I.    Factual Background[4]

Since 1898, the Harrisons have operated hospitality, dining, and fishing businesses in Talbot County, Maryland.  *See* ECF 8-2 ¶ 3, Declaration of Levin F. Harrison, IV ("Decl. of Harrison IV").  During the early 1930s, Levin F. Harrison, Jr., purchased the property and building that the Harrison family continues to operate as Harrison's Country Inn (the "Inn").  ECF 8-2 ¶ 11, Decl. of Harrison IV.  Harrison III and his wife, Roberta Harrison, inherited the Inn during the late 1970s.

During the eighty years in which the Harrison family has owned the Inn, the Harrisons have improved the property repeatedly.  According to Mr. Harrison, the Inn includes more than forty rooms for overnight guests, a restaurant and bar that can accommodate about one hundred patrons, a small gift shop, and a marina with slips from which customers can charter fishing cruises on numerous vessels owned by independent contractors.  The flagship of this charter fleet is Captain Buddy, a thirty-six ton fishing boat jointly owned by Harrison IV and the Estate of Harrison III.  *See* ECF 3-2, Website of Harrison House Family (describing ships available for charter); ECF 17-11 at 8, 12, Preferred Ship Mortgage.

---

[4] In the factual summary, I rely on my notes of testimony adduced at the hearing held on September 3, 2015, without citation.  Unfortunately, I do not have a transcript of the proceedings.

In May 1983, the Harrisons formed HCI, an S-Corporation, which "operates [the] family's country inn, restaurant, and charter fishing facility. . . ." ECF 8-2 ¶ 3, Decl. of Harrison IV; *see* LNV Exhibit K at 1, 2014 U.S. Income Tax Return for an S Corporation, Form 1120S, Harrison's Country Inn & Sportfishing Center, Inc.  In February 2010, HCI's shareholders were Harrison III, who owned 33.34% of HCI's stock; Roberta Harrison, who owned 33.33% of HCI's stock; and Harrison IV, who owned 33.33% of HCI's stock.  ECF 8-2 ¶ 4, Decl. Harrison IV.

The Harrisons established HFB in early 2003.  *See* ECF 8-2 ¶ 5, Decl. of Harrison IV; LNV Exhibit F at 1, 2014 Return of Partnership Income, Form 1065, Harrison Family Business, LLC. It was "formed . . . to own, operate and manage real estate" to which the Harrison family already held title.  ECF 8-2 ¶ 5, Decl. of Harrison IV.  According to Harrison IV, HFB is a "real estate holding company."  *See also* LNV Exhibit F at 1, 2014 Return of Partnership Income, Form 1065, Harrison Family Business, LLC (listing HFB's principal business activity as "investment" and its principal product or service as "real estate").

Upon creation of HFB, Harrison III and Roberta Harrison each held a fifty percent membership interest in HFB.  ECF 8-2 ¶ 5, Decl. of Harrison IV.  Apparently sometime between January 1, 2003, and February 16, 2010, Harrison III and Roberta Harrison transferred three properties to HFB: the Inn and two smaller properties in Talbot County, Maryland.  *See* ECF 8-2 ¶ 5, Decl. of Harrison IV.[5]  Harrison IV is currently HFB's managing agent.

As noted, HCI operates the Harrison family's numerous business activities.  It manages all aspects of the Inn, from renting out rooms, operating the restaurant, chartering boats at the

---

[5] The properties are located at 21544 Chesapeake House Drive, Tilghman, Maryland 21671; 21415 Main Street, Tilghman, Maryland 21671; and Lot 1, 0.878 Acres, E/S Main Street, Tilghman, Maryland 21671. ECF 17-2 at 17-18, Deed of Trust for HFB Term Loan, Exhibit A.

marina, to paying expenses. *Id*. HCI rents or owns most of the Inn's furnishings and kitchen equipment. *Id*. HCI also rents out, receives revenue from, and pays expenses for property that members of the Harrison family own individually. *Id*. For example, HCI lets, maintains, and pays expenses for a nearby guesthouse that Harrison IV and Leslie Harrison purchased in 1990. *Id*. HCI also manages Captain Buddy. *Id.* In addition, HCI operates, at least partially, other Harrison family enterprises, such as Harrison Oyster Company, LLC (a.k.a. Harrison Brothers Oysters), which appears to be a separate business distinct from the Inn. *Id*.; LNV Exhibit M at 1, Harrison's Country Inn & Sport Fishing Center, Inc., Balance Sheet as of December 31, 2014.

At the height of the summer season, HCI employs between thirty and fifty full and part-time employees. Seven Harrison family members are on HCI's payroll, including Harrison IV, who is HCI's President, and Leslie Harrison, who manages the Inn's restaurant kitchen and gift shop. *Id.*

Testimony at the hearing suggested that, prior to February 2010, the total Harrison family debt amounted to about $2,500,000, inclusive of personal debt. During fall 2009, Harrison III, Roberta Harrison, and Harrison IV entered into discussions with BOES to consolidate and refinance the various existing loans and to borrow an additional $200,000. *See* ECF 8-2 ¶ 9, Decl. of Harrison IV.

On February 16, 2010, BOES extended two commercial loans to HFB. The first loan is a term loan for $2,600,000. *See* ECF 17-1, Promissory Note Secured by Deed of Trust; *see also* ECF 17 at 3, Amended Complaint; ECF 8-1 at 2, Opposition Memo. The second loan is a revolving loan for $100,000. ECF 17-5, Bank of Eastern Shore Revolving Loan Note. Each loan is secured by a Deed of Trust. ECF 17-2, Deed of Trust for HFB Term Loan; ECF 17-7, Deed of Trust for HFB Revolving Loan. The Deed of Trust for each loan identified as the trust's

property the three parcels, including the Inn, that Harrison III and Roberta Harrison had transferred to HFB. ECF 17-2 at 17-18, Deed of Trust for HFB Term Loan, Exhibit A; ECF 17-7 at 18-19, Deed of Trust for HFB Revolving Loan, Exhibit A; *see also* ECF 8-2 ¶ 5, Decl. of Harrison IV; ECF 17 at 3-4, Amended Complaint. Harrison III, Roberta Harrison, and Harrison IV each signed both deeds of trust as members of HFB. ECF 17-2 at 15, Deed of Trust for HFB Term Loan; ECF 17-7 at 16, Deed of Trust for HFB Revolving Loan. As discussed, *infra*, Harrison IV was not actually a member of HFB at that time.

The loans were also secured with HFB's anticipated stream of rental income. In particular, HFB executed an Assignment of Rents and Leases for each loan, which Harrison III, Roberta Harrison, and Harrison IV signed as members of HFB. ECF 17-3 at 8, Assignment of Rents and Leases; ECF 17-10 at 8, Assignment of Rents and Leases. Each assignment of rents and leases "transfer[s] and assign[s] unto [BOES], its successors and assigns, all rights, title and interest of [HFB] in, to and under any and all leases relating to or affecting the property" listed in the deeds of trust. ECF 17-3 § 1 at 2, Assignment of Rents and Leases; ECF 17-10 § 1 at 2, Assignment of Rents and Leases. Similarly, each deed of trust provides that "[a]ll Leases shall be subject to the prior written approval of the Beneficiary, and shall contain a provision prohibiting subleasing or assigning by any Tenant without the prior written approval of" BOES. ECF 17-2 § 7.03 at 7, Deed of Trust for HFB Term Loan; ECF 17-7 § 7.04 at 7, Deed of Trust for HFB Revolving Loan. Defendants admit that HFB has never leased out its properties nor collected any rent.

Harrison III, Roberta Harrison, Harrison IV, Leslie Harrison, and HCI executed personal guaranty agreements for the loans. ECF 17-4, Guaranty; ECF 17-5, Guaranty; ECF 17-8, Guaranty; ECF 17-9, Guaranty. As additional security for the loans, Harrison III and Harrison

IV also provided BOES with a Preferred Ship Mortgage as to Captain Buddy.   ECF 17-11, Preferred Ship Mortgage.

Harrison IV concedes that he was not, in fact, a member of HFB when he signed the loan documents as a purported member.   ECF 8-2 ¶¶ 7, 8, Decl. of Harrison IV.   He explains that he "was mistaken in [his] good faith belief" that he had received a membership interest in HFB before signing the loan documents. *Id.* ¶ 8.

Of import here, both the deeds of trust and the Preferred Ship Mortgage permit the lender to appoint a receiver upon default of the loans.   Each deed of trust provides, in relevant part: "Upon the occurrence of an Event of Default, the Beneficiary shall be entitled to the immediate appointment of a receiver for the Trust Property without regard to the value of the Trust Property or the solvency of any person liable for payment of the amounts due under the Loan Documents."   ECF 17-2 § 10.13 at 13, Deed of Trust for HFB Term Loan; ECF 17-7 § 10.13 at 14, Deed of Trust for HFB Revolving Loan.   Similarly, the Preferred Ship Mortgage provides, in pertinent part, ECF 17-11 at 6:

> If any legal proceeding shall be taken to enforce any rights under this Ship Mortgage, Lender shall be entitled as a matter of right to the appointment of a receiver of the Vessel and of Grantor's proceeds, payments and other Rights.   Such a receiver shall be entitled to reasonable compensation, which additional compensation shall be secured by this Ship Mortgage in the form of an Additional Advance as provided herein.

During 2011, HFB apparently received more than $2,300,000 from DAS Corporation ("DAS") and its owner, David Abel, a former customer of the Inn.   Whether this sum constituted a loan, investment, or gift is unclear.   HFB's financial records list $2,374,283.19 in long-term liabilities to DAS and Mr. Abel.   LNV Exhibit H at 1, Harrison Family Business, LLC Balance Sheet as of December 31, 2014.   Defendants' accountant, Jason Brown, testified that HFB booked the funds as a liability for tax purposes.   However, HFB executed no loan documents to

obtain this sum.  Rather, according to Mr. Harrison, Mr. Abel described the payment as a "gift from God" at a prayer breakfast over the 2011 Labor Day Weekend.  The testimony and other evidence showed that the Harrisons used $262,473.19 of these funds to service their loans to BOES, and they used the remaining $2,111,810.00 to remodel HFB's properties.  *See* LNV Exhibit H at 1, Harrison Family Business, LLC Balance Sheet as of December 31, 2014.

On September 15, 2011, BOES, HFB, and the loans' guarantors executed a loan modification.  Among other things, it reduced the loans' interest rates and extended HFB's repayment schedule.  ECF 17-12, Modification to Promissory Notes and Loan Documents.

As noted, on April 27, 2012, the Maryland Commissioner of Financial Regulation closed BOES (ECF 17 at 8, Amended Complaint) and the FDIC was appointed BOES's receiver.  *Id.* On August 20, 2014, the FDIC, as BOES's Receiver, assigned to LNV the deeds of trust that HFB had executed to secure its loans from BOES.  ECF 17-13, Assignment of Deed of Trust; ECF 17-14, Assignment of Deed of Trust.  LNV recorded the assignments in the land records of Talbot County, Maryland.  *Id.*

In 2013, HFB began to miss payments due on the BOES loans.  ECF 17 at 9, Amended Complaint; *see* ECF 32 at 7-8, Answer to Amended Complaint.  At the hearing, Mr. Harrison conceded that HFB has not made payments on either loan in over a year.  On November 13, 2014, LNV, as BOES's successor in interest, demanded that HFB and the loans' guarantors bring the notes current.  ECF 17-15, Letter from LNV's Counsel to Defendants dated Nov. 13, 2014; ECF 17-16, Letter from LNV's Counsel to Defendants, dated Nov. 13, 2014.  When HFB failed to make payment, LNV brought this suit.  ECF 1, Complaint.

## II.    Discussion

### A.  Appointment of a Receiver

Under Fed. R. Civ. P. 66, "the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule."  The matter of the appointment of a receiver by a federal court in a diversity action "appears to be a question properly determined on the basis of federal law." 12 Wright & Miller, Federal Practice and Procedure (2014) § 2983 at 25 ("Wright & Miller").   Pursuant to federal law, "[t]he appointment of a receiver by a federal court may be sought by any person or class having an interest in property that a statute or one of the general principles of equity authorizes the court to protect by this remedy."  *Id*. at 14.

"[R]eceivership . . . should be resorted to only on a plain showing of some threatened loss or injury to the property, which the receivership would avoid."  *Gordon v. Washington*, 295 U.S. 30, 39 (1935).  *See Kelleam v. Maryland Cas. Co. of Baltimore, Md.*, 312 U.S. 377, 380-82 (1941).  It is an "extraordinary equitable remedy," *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.,* 999 F.2d 314, 316 (8th Cir. 1993), which remains "a matter resting in the sound discretion of the District Judge." *Lias v. United States*, 196 F.2d 90, 92 (4th Cir. 1952).

Neither the Supreme Court nor the Fourth Circuit has provided a concrete list of factors for courts to weigh in considering whether to appoint a receiver.  *See Manuel v. Gembala*, No. 7:10-CV-4-FL, 2010 WL 3860407, at *6 (E.D.N.C. Sept. 30, 2010) (noting that "there is no precise formula for determining whether receivership is appropriate").   But, courts have considered a variety of factors before appointing a receiver. *See Brill & Harrington Investments v. Vernon Sav. & Loan Ass'n*, 787 F. Supp. 250, 253 (D.D.C. 1992).  In Wright & Miller, *supra*, § 2983 at 19-22 (citations omitted), the following considerations are set forth:

fraudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

In *Aviation Supply Corp.*, 999 F.2d 314, the Eighth Circuit considered in a diversity case whether to appoint a receiver on behalf of a judgment creditor. The court noted that appointment of a receiver "is only justified in extreme situations," and that "there is no precise formula" as to whether such an appointment is warranted. *Id.* at 316. But, it identified "factors typically warranting appointment," *id.* at 316, such as the following, *id.* at 316-17:

a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm.

The Fifth Circuit applies the same test. *See Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241-42 (5th Cir. 1997) (quoting *Aviation Supply Corp.*, 999 F.2d at 316). And, the court in *Manuel*, 2010 WL 3860407, at *7, also relied on *Aviation Supply Corp.*, 999 F.2d at 316-17.[6]

Here, as noted, the loan documents provide for appointment of a receiver upon default. "There is a split of authority over whether the parties' advance consent to the appointment of a

---

[6] Defendants cite a Ninth Circuit case that articulates substantially similar factors, ECF 8-1 at 6, Opposition Memo: "(1) 'whether [the party] seeking the appointment has a valid claim'; (2) 'whether there is fraudulent conduct or the probability of fraudulent conduct,' by the defendant; (3) whether the property is in imminent danger of 'being lost, concealed, injured, diminished in value, or squandered'; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) 'the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property'; and, (7) 'whether [the] plaintiff's interests sought to be protected will in fact be well-served by receivership.'" *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009) (citations omitted).

receiver in the mortgage documents is dispositive to the issue of appointment, or whether it is simply one factor among the others that a court must consider." *Fed. Nat. Mortgage Ass'n v. Mapletree Investors Ltd. P'ship*, No. 10-CV-10381, 2010 WL 1753112, at *3 (E.D. Mich. Apr. 30, 2010).

I am unaware of any guidance by the Fourth Circuit as to how a contractual provision in a loan agreement providing for the appointment of a receiver upon default impacts a court's analysis in considering appointment of a receiver.  But, when the parties contractually agree in advance to appointment of a receiver, some courts have dispensed with analyzing equitable considerations, concluding that a contractual provision in a loan agreement requiring the appointment of a receiver upon default is sufficient basis for a court to appoint a receiver.  *See, e.g.*, *Britton v. Green*, 325 F.2d 377, 382 (10th Cir. 1963);  *Am. Bank & Trust Co. v. Bond Int'l Ltd.*, No. 06-CV-0317-CVE-FMH, 2006 WL 2385309, at *5 (N.D. Okla. Aug. 17, 2006).  Other courts have said that "courts retain the 'discretion to deny appointment of a receiver under appropriate circumstances even though the mortgage provides the mortgagee a specific right to an appointment.'"  *D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc.*, 550 F. Supp. 2d 481, 491 (S.D.N.Y. 2008) (*quoting Ariani v. 1075 Concourse Tenants Corp.*, No. 93 Civ. 0377, 1999 WL 637238, at *2 (S.D.N.Y. Aug. 20, 1999)).  Pointing to the equitable nature of receivership as a remedy, these courts have recognized that "consent to a receiver does not affect the court's need to weigh . . . [equitable] . . . factors in determining whether a receiver is necessary."  *Sterling Sav. Bank v. Citadel Dev. Co.*, 656 F. Supp. 2d 1248, 1262 (D. Or. 2009).  *See also Gage v. First Fed. Sav. & Loan Ass'n of Hutchinson, Kan.*, 717 F. Supp. 745, 750 (D. Kan. 1989) ("'Appointment of a receiver is not automatic because of a clause in the mortgage

agreement; the mortgagee must go through the normal legal channels to obtain a receiver.'")
(citation omitted).

Even if contract language is not dispositive as to appointment of a receiver, "the
existence of [contract] language, presumably negotiated between the parties, is a factor militating
in plaintiff's favor and the party opposing the appointment bears the burden of demonstrating
why a receiver should not be appointed." *D.B. Zwirn Special Opportunities Fund*, 550 F. Supp.
2d at 491 (citations omitted). Moreover, even those courts that suggest that analysis of equitable
factors is unnecessary where a loan agreement calls for the appointment of a receiver upon
default nonetheless frequently engage in equitable analysis. *See, e.g., Cadence Bank, N.A. v.
Manausa Holdings, LLC*, No. 4:12CV38-WS/WCS, 2012 WL 1252494, at *3-4 (N.D. Fla. Mar.
30, 2012); *Wells Fargo Bank, N.A. v. Walnut Equity Partners, LLC*, No. CIV.A. 10-10287-PBS,
2010 WL 1065004, at *2-4 (D. Mass. Mar. 17, 2010); *Fed. Nat. Mortgage Ass'n v. Maple Creek
Gardens, LLC*, No. 09-14703, 2010 WL 374033, at *2-3 (E.D. Mich. Jan. 25, 2010).

In my view, the parties cannot, through their contract, obligate the court to appoint a
receiver. "The receiver is considered to be an officer of the court," Wright & Miller, *supra*,
§ 2981 at 5, and thus creates obligations for the court. But, the parties' agreement is one factor,
among many, in the court's consideration. Therefore, I will consider the provisions in the loan
documents and the Preferred Ship Mortgage that call for a receiver, along with the equitable
factors.

For the reasons discussed below, equitable considerations favor appointment of a receiver
for HFB. But, the same equities militate against appointment of a receiver for Captain Buddy.

### B.  HFB

#### 1.  The Contract Documents

As noted, both deeds of trust (ECF 17-2 § 10.13 at 13; ECF 17-7 § 10.13 at 14), and the Preferred Ship Mortgage on Captain Buddy (ECF 17-11 at 6), provide for the appointment of a receiver in the event of a default by the borrower, HFB.  The deeds of trust specify that, "[u]pon the occurrence of an Event of Default," the lender is "entitled to the immediate appointment of a receiver for the Trust Property. . . ."  ECF 17-2, Deed of Trust for HFB Term Loan, § 10.13 at 13; ECF 17-7, Deed of Trust for HFB Revolving Loan, § 10.13 at 14.  Similarly, the Preferred Ship Mortgage provides that the "Lender shall be entitled as a matter of right to the appointment of a receiver" "[i]f any legal proceeding shall be taken to enforce any rights under this Ship Mortgage."  ECF 17-11 at 6, Preferred Ship Mortgage.

HFB has failed to make payments on the BOES loans for more than a year.  ECF 17 at 9-10, Amended Complaint; ECF 32 at 7, Answer to Amended Complaint.  In particular, defendants concede that HFB "has failed to make 15 consecutive scheduled payments on the Term Note, and 16 consecutive scheduled payments on the Revolving Loan Note."  ECF 32 at 7, Answer to Amended Complaint.  Defendants have asserted affirmative defenses, at least some of which are the subject of LNV's motion to strike.  ECF 41, Motion to Strike Defendants' Affirmative Defenses; ECF 41-1, Memorandum in Support of Motion to Strike Defendants' Affirmative Defenses.  In essence, defendants blame BOES for lending HFB the money.  *See* ECF 32 at 14, Answer to Amended Complaint.  That motion is pending.  Nonetheless, there is no dispute that HFB is in default.

To be sure, the appointment of a receiver is an "extraordinary equitable remedy . . . ." *Aviation Supply Corp.*, 99 F.2d at 316. But, it is a remedy that the parties bargained for in the event of circumstances that are now at hand. Therefore, I turn to the equitable considerations.

## 2.     Fraud

LNV submits that Harrison IV fraudulently executed the loan documents by signing as a member of HFB when, in fact, he was not a member of HFB. ECF 3 at 3, Receiver Motion; ECF 8-2 ¶ 8, Decl. of Harrison IV. But, defendants contend that Harrison IV was under the misapprehension that the family's accountant had transferred a membership interest in HFB to him before the loan documents were signed, and that the loan documents were signed in good faith. ECF 8-2 ¶ 8, Decl. of Harrison IV.

At this juncture, the Court cannot resolve whether, as Harrison IV asserts, he mistakenly believed that he was a member of HFB when he signed the loan documents. Nor is there any basis to conclude that, but for Mr. Harrison's alleged status as a member of HFB, BOES would not have extended the loans. However, because Mr. Harrison is a guarantor of both loans (ECF 17-4 at 4, Guaranty; ECF 17-8 at 4, Guaranty), it is difficult to discern how BOES would have been defrauded by what occurred.

LNV also contends that the Harrisons dissipated assets from HFB in the form of "advances" to members of the Harrison family and entities that the Harrisons control. LNV introduced evidence at the Motion hearing that showed "advances" to Harrison family members and enterprises owned by the Harrisons. *See, e.g.,* LNV Exhibit F at 13, 2014 Return of Partnership Income, Form 1065, Harrison Family Business, LLC.

Defendants presented the testimony of Mr. Harrison and defendants' accountant, Mr. Brown, that the alleged "advances" do not reflect an intentional dissipation of funds. Rather,

defendants argue, "advances" on HFB's balance sheets reflect an accounting method that captures the centralized fashion in which the Harrisons operate their businesses. HFB's "advances" were to individuals who are guarantors or to entities owned by guarantors. In the posture of the case, I cannot conclude that these transfers were designed to defraud HFB's creditor by placing assets beyond LNV's reach.

### 3. Diminished Value

LNV contends that the Harrisons have breached their contractual obligations under the loan agreements to operate HFB as a commercial landlord that collects rent on its properties. As a result, LNV maintains that its interest in HFB has been and will be diminished.

As discussed earlier, defendants created HFB in 2003 as a "real estate holding company." *See* LNV Exhibit F at 1, 2014 Return of Partnership Income, Form 1065, Harrison Family Business, LLC (listing HFB's principal business activity as "investment" and its principal product or service as "real estate"). When HFB obtained the loans at issue here, HFB agreed that it would "provide competent and responsible management" of HFB's real property. ECF 17-2 §7.02 at 7, Deed of Trust for HFB Term Loan; ECF 17-7 §7.02 at 7, Deed of Trust for HFB Revolving Loan. Both the deeds of trust and the assignments of rents and leases seemed to anticipate that HFB would enter into lease agreements for the property that is the subject of the deeds of trust. ECF 17-2 § 7.03 at 7, Deed of Trust for HFB Term Loan; ECF 17-7 § 7.04 at 7-8, Deed of Trust for HFB Revolving Loan. An identical section in each deed of trust, for example, provides that "[a]ll Leases shall be subject to the prior written approval of the Beneficiary, and shall contain a provision prohibiting subleasing or assigning by any Tenant without the prior written approval of" BOES. ECF 17-2 § 7.03 at 7, Deed of Trust for HFB Term Loan; ECF 17-7 § 7.04 at 7, Deed of Trust for HFB Revolving Loan. Similarly, each assignment of rents and

leases "transfer[s] and assign[s] unto [BOES], its successors and assigns, all rights, title and interest of [HFB] in, to and under any and all leases relating to or affecting the property" listed in the deeds of trust.   ECF 17-3 § 1 at 2, Assignment of Rents and Leases; ECF 17-10 § 1 at 2, Assignment of Rents and Leases.  As LNV submitted at oral argument, the borrower pledged not just its real property, but also its rental income as security for a loan.

Notwithstanding provisions in the loan documents that seemed to anticipate that HFB would rent its real property, Mr. Harrison could not identify any lease agreements between HFB and HCI.  *Id.*  Nor has HCI actually paid "rent" to HFB in the form of a monetary transfer. Rather, it has used an accounting method to confer a tax benefit on HCI.  In its most recent tax return, which defendants prepared shortly before the Motion hearing, HCI reported $119,061 in "rent" for the use of HFB's facilities during 2014.  LNV Exhibit K at 1, 2014 U.S. Income Tax Return for an S Corporation, Form 1120S, Harrison's Country Inn & Sport Fishing Center, Inc. Defendants' accountant, Mr. Brown, testified that the $119,061 "rent" reported on HCI's 2014 income tax return is an estimated fair market value of the rent that HCI theoretically could have paid HFB for the use of HFB's properties.  Although Mr. Brown maintained that HCI's report of rent in the amount of $119,061 paid to HFB is permissible for purposes of tax accounting, *id.*, Mr. Harrison conceded that, to his knowledge, HCI has never made an actual rent payment of HFB.

By using HFB's property without paying rent for the past four and half years, HCI has benefited financially from what is effectively free rent, while HFB has suffered.  At the end of 2014, HFB, which lists assets of more than $3,000,000, had a cash balance of merely $58.56. LNV Exhibit H at 1, Harrison Family Business, LLC, Balance Sheet as of December 31, 2014. And, the municipal sewer bills for HFB's properties are past due.  *See* Talbot County Sanitary

District Sewer Bills, LNV Exhibit I.   As Mr. Harrison acknowledged, this could ultimately precipitate a tax sale of the properties.[7]

At the Motion hearing, both Mr. Harrison and Mr. Brown testified that HCI has realized a modest profit over the past two years.   But, HCI has withheld funds from HFB, in part, because HCI consciously has chosen to use its modest proceeds to pay the vendors it needs in order for the Inn to operate.   HCI's decision to repay its vendors has come at the expense of HFB, which has lacked funds necessary to repay its loan obligations.   As defendants explained at the Motion hearing, the Harrison family's various enterprises are insufficiently profitable to pay both HCI's vendors and service HFB's debt to LNV.

LNV contends that, "if the collateral property is not adequately and professionally managed," its value will diminish before LNV is able to obtain judicial relief and foreclosure on HFB's properties.   ECF 20 at 7-8, Reply.   According to LNV, as BOES's successor in interest, it has been deprived of "competent and responsible management" of HFB's real property, for which BOES contracted when it extended the loans.   ECF 17-2 § 7.02 at 7, Deed of Trust for HFB Term Loan; ECF 17-7 § 7.02 at 7, Deed of Trust for HFB Revolving Loan.

It is clear that the Harrisons are not managing HFB as an independent commercial landlord that rents out its properties for compensation.   The businesses are family owned and operated, and corporate formalities do not seem to be carefully observed, except to the extent that they provide tax advantages.   HCI has full use of HFB's property but does not pay for it.   For tax purposes, the Harrisons estimate that the annual fair market value of rent for HFB's properties is $119,061.   LNV Exhibit K at 1, 2014 U.S. Income Tax Return for an S Corporation, Form 1120S, Harrison's Country Inn & Sport Fishing Center, Inc.   Yet, HFB does not collect

---

[7] Mr. Harrison testified that he typically pays the past due sewer bills for the properties each September by transferring funds from HCI to HFB, thereby avoiding a tax sale.

any funds.   HCI's continued rent-free use of HFB's properties diminishes HFB's value. Moreover, HCI's rent-free use of HFB's properties eliminates a stream of rental income that the loan agreements anticipated as further security for the loans.

I agree with LNV that there is imminent danger that LNV's interest in HFB will be diminished in value in the absence of the appointment of a receiver.

### 4.   Adequacy of Other Legal Remedies

LNV contends that a receiver is necessary because "[t]he appointment of a receiver here will ensure the Borrower's assets are not wasted, hidden, or otherwise misappropriated during the pendency of this litigation, and while LNV attempts to secure and collect on a monetary judgment." ECF 20 at 7, Reply.  LNV asserts:  "Only by appointing a receiver can the Court and LNV be assured that LNV's secured interests in the collateral property [will be] adequately protected." ECF 20 at 8, Reply.

Defendants counter that a receiver is inappropriate because "a remedy at law is available to LNV." ECF 8-1 at 7, Opposition Memo.  They emphasize that a receiver "is an extraordinary remedy" (*id.* at 7), without identifying less drastic equitable remedies that are suitable here.

Of course, LNV has sued defendants to enforce its rights under the loan agreements. ECF 17 at 10-13, Amended Complaint; *see* ECF 17-1 at 3-4, Promissory Note Secured by Deed of Trust; ECF 17-6 at 6, Bank of Eastern Shore, Revolving Loan Note.  In addition, on August 12, 2015, LNV initiated foreclosure proceedings against HFB in a Maryland court.  ECF 58-1 at 1, Notice of Intent to Foreclose.  But, LNV's legal remedies are inadequate.

Foreclosure proceedings against HFB and pursuit of litigation are not quick remedies. And, in the meantime, HFB continues to allow itself to function as if it were the property of HCI. The inter-related entities are all owned by Harrison family members, and there is little incentive

for HCI to pay rent to HFB for the Inn, knowing that the money would be earmarked for LNV. Were HCI to pay rent to HFB, this obligation would frustrate the Harrisons' ability to use the limited proceeds from the Inn to pay their vendors. *See id.*

Although the appointment of a receiver is an "extraordinary equitable remedy," *Aviation Supply Corp.,* 999 F.2d at 316, the parties bargained for precisely this remedy upon default when they entered into the loan agreements. ECF 17-2 § 10.13 at 13, Deed of Trust for HFB Term Loan; ECF 17-7 § 10.13 at 14, Deed of Trust for HFB Revolving Loan. Moreover, defendants have not suggested, nor can the Court conceive, of a less drastic equitable remedy that would afford the same protection to LNV's property interests in HFB, including the stream of rental income that the loan agreements anticipated.

### 5. The Proposed Receiver

LNV proposes the appointment of Robert J. Kim, Esquire as receiver for HFB. ECF 3-1 at 5, Receiver Motion. "Mr. Kim has more than 30 years' experience as a Maryland attorney, with an expertise in lending, loan recovery, and receivership." *Id.*; *see* ECF 3-3, Receiver Motion, Exhibit B, Resume of Robert J. Kim. Mr. Kim testified at the hearing that he has experience in managing restaurants and in offering legal advice to clients in the dining and hotel sectors. On August 16, 2015, Mr. Kim visited the Inn and spoke with Mr. Harrison. *Id.*

At the Motion hearing, defendants stipulated that Mr. Kim possesses the qualifications to serve as a competent receiver for HFB. Nonetheless, they maintain that "[d]efendants are in the best position to operate and manage the business based upon their long-standing history and knowledge of the business." ECF 8-1 at 6, Opposition Memo.

I am satisfied that the appointment of Mr. Kim as receiver for HFB likely will do more good than harm. As defendants concede, Mr. Kim has impressive professional credentials and

experience in areas relevant to HFB's business, including hospitality and dining.  Mr. Kim has also visited the Inn to familiarize himself with its operations.  And, I am not persuaded that "[d]efendants are in the best position to operate and manage" HFB.  ECF 8-1 at 6, Opposition Memo.  The record shows that the Harrisons have not, during the entire term of the loans, managed HFB so as to protect HFB's interests as a commercial landlord.  Insofar as Mr. Kim requires any specialized knowledge that the Harrisons alone possess, Mr. Kim can, as Mr. Kim has already suggested, solicit input from Mr. Harrison.

### C.  Captain Buddy

Harrison III and Harrison IV pledged Captain Buddy as collateral for the loans made by BOES to HFB.  ECF 17-11 at 2, Preferred Ship Mortgage; *see also* ECF 17 at 9, Amended Complaint; ECF 32 at 7-8, Answer to Amended Complaint.  At the Motion hearing, counsel for LNV acknowledged that the Preferred Ship Mortgage provides LNV with a lien on Captain Buddy, because Harrison III and Harrison IV granted BOES a security interest in Captain Buddy to obtain the loans for HFB.  *Id.*  Given that HFB has not made payments on the loans in over a year, and is in default, LNV appears to have a valid claim to the collateral.

Although analysis of equitable factors favors appointment of a receiver for HFB, the same considerations militate against appointment of a receiver for Captain Buddy.  Unlike HFB, Captain Buddy was not the borrower.  It is merely collateral for the loans made to HFB.

To be sure, the Preferred Ship Mortgage grants BOES "a continuing security interest" in "[a]ny and all proceeds of or with regard to the Vessel" as well as "[a]ny and all present and future leases or charters affecting the Vessel."  ECF 17-11 at 4, Preferred Ship Mortgage.  LNV maintains that a receiver is necessary to ensure that LNV obtains "any proceeds the vessel receives pursuant to any contracts its owners have entered into with Harrison's Country Inn in

connection with the vessel's use by that business."  ECF 20 at 5, Reply.  Yet, it is unclear from

the evidence whether Captain Buddy receives "proceeds" that are "pursuant to any contracts its

owners have entered into with Harrison's Country Inn."  ECF 20 at 5, Reply.

Although LNV introduced evidence concerning HFB's operations, LNV offered little

evidence regarding the relationship between Captain Buddy and HCI.  Mr. Harrison testified that

Captain Buddy serves as a charter fishing vessel at the Inn's marina.  Mr. Harrison also testified

that HCI "charters" Captain Buddy, without providing further details.  LNV's evidence

illustrates that the Inn advertises Captain Buddy as a charter fishing vessel.  ECF 3-2 at 2,

Receiver Motion, Exhibit A, Website of Harrison House Family (depicting what appears to be

Captain Buddy prominently displayed on the Inn's website).  The record suggests that Captain

Buddy functions now in precisely the same fashion as it did when Harrison III and Harrison IV

conveyed a security interest in the vessel to BOES.

Moreover, there was no evidence that Captain Buddy is being mismanaged.  LNV

submits that "[a] commercial fishing vessel must be maintained in good working order and

condition to retain its value" (ECF 20 at 5, Reply), but LNV offered no evidence that Captain

Buddy is in imminent danger of diminution in value.  For example, there is no evidence that

Captain Buddy's owners have permitted the vessel to fall into disrepair.  According to Mr.

Harrison, HCI pays for Captain Buddy's routine maintenance and upkeep.

Further, LNV has not shown that the appointment of Mr. Kim as Captain Buddy's

receiver, as it requested, is likely to do more good than harm.  Despite Mr. Kim's credentials in

the hospitality and dining industries, Mr. Kim conceded at the hearing that he has no experience

serving as a receiver for a charter boat.  In fact, Mr. Kim indicated that he would need to depend

on Mr. Harrison for guidance in administering Captain Buddy.

Defendants reasonably assert: "Guests and tourists from across the State and Mid-Atlantic desire to take trips on Captain Buddy with Levin F. Harrison, IV and his family members because of the authenticity and unique experience they provide.  LNV's interest will not be well-served by a receivership of Captain Buddy because a receiver cannot offer the same unique experience or generate the same type of business."  ECF 8-1 at 7, Opposition Memo.

Given that LNV has not demonstrated that the Harrisons are mismanaging Captain Buddy, and there is no evidence of a risk of diminution in its value, LNV has not demonstrated that appointment of a receiver for Captain Buddy likely will do more good than harm.  In addition, even if a receiver were warranted, Mr. Kim does not appear to have the requisite experience to serve as a receiver for a charter fishing vessel.

### D.    Preliminary Injunction

LNV "seeks injunctive relief (i) prohibiting Borrower and the Guarantors from disposing of the rents on hand which flow from the operations of the Trust Property and 'Captain Buddy' other than by turning them over to the receiver, (ii) prohibiting Borrower, its agents or employees and the Guarantors from interfering with the receiver, and (iii) ordering Borrower and the Guarantors to cooperate with the receiver."  Receiver Motion, EFC 3-1 at 6.  LNV maintains that the requested injunction "would only require that Borrower and the Guarantors cooperate and not interfere with a receiver."  *Id.* at 8.  LNV thus asks the Court to arm the receiver with a preliminary injunction to battle defendants for mastery of HFB.

Defendants argue that LNV is not entitled to injunctive relief because "[t]he purpose of a preliminary injunction is to maintain the status quo until the merits of the case can be decided" and that granting LNV injunctive relief "would in effect be changing the status quo."  ECF 8-1 at 8, Opposition Memo.

A preliminary injunction is an extraordinary remedy.  *See Munaf v. Geren,* 553 U.S. 674, 689-90 (2008).  As the Fourth Circuit observed in *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013), a preliminary injunction involves "the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." (Quotation marks and citation omitted.)  It is a remedy that "'is granted only sparingly and in limited circumstances.'"  *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted).

To obtain injunctive relief, the claimant must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 19 (2008).  All four requirements must be satisfied.  *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

Beyond appointment of a receiver for HFB, LNV has not shown that it will suffer irreparable harm in the absence of preliminary relief.

First, contrary to the apparent assumption that underpins LNV's motion for injunctive relief, a receiver does not need to go into the field carrying a preliminary injunction.  *Ledbetter v. Farmers Bank & Trust Co.*, 142 F.2d 147, 150 (4th Cir. 1944) ("It is well recognized that a receiver is the agent only of the court appointing him").  A receiver "is custodian of property which is under the control of the court."  *Id.* at 150.  Under 28 U.S.C. §959(b), "a . . . receiver . . . appointed in any case pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession . . . according to the

requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." *See* Wright & Miller, *supra*, § 2981 at 4 (2014).  Under court supervision, a receiver thus wields the power of the property owner.

A receiver is by no means toothless.  If any party seeks to frustrate a receiver in the execution of his or her duties, the receiver may return to court to seek appropriate relief.  Mr. Kim acknowledged as much in his testimony and indicated that he would do so if he encounters any obstacles.

Second, LNV's motion for injunctive relief anticipates without basis that defendants will seek to undermine the receiver in performing his court-ordered duties.  LNV has not demonstrated that defendants are likely to interfere with the receiver.  Mr. Harrison was a credible witness who spoke candidly about the difficult decisions that the Harrison family has made in allocating its finite proceeds to service debts to vendors rather than repay HFB's debts to LNV.  That the Harrisons have not operated HFB as a commercial landlord that collects rent is a factor that supports appointment of a receiver.  It does not, however, show dishonesty on the part of defendants, much less suggest that defendants will undermine the receiver.

**E.  Conclusion**

For the foregoing reasons, I will grant LNV's Motion (ECF 3) in part and deny it in part. In particular, I will appoint Mr. Kim as Receiver for HFB, subject to the submission by LNV of a proposed order that appropriately sets forth his duties and responsibilities.[8]  In all other respects, the Motion will be denied.

A separate Order follows, consistent with this Memorandum.

---

[8] The proposed order submitted by LNV at ECF 5 is too broad and includes appointment of a receivership for Captain Buddy.

Date:   September 18, 2015          _____/s/_____
                                    Ellen Lipton Hollander
                                    United States District Judge