IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LNV CORPORATION,

    *Plaintiff,*

    v.

HARRISON FAMILY BUSINESS,
LLC, *et al.*

    *Defendants.*

Civil Action No.: ELH-14-03778

**MEMORANDUM OPINION**

On December 3, 2014, LNV Corporation ("LNV"), successor in interest to the Bank of

Eastern Shore ("BOES"), filed suit against Harrison Family Business, LLC ("HFB"), alleging

default on a commercial loan for $2,600,000 ("Term Loan") that HFB had obtained from BOES

in February 2010.[1]  ECF 1, Complaint.  The Term Loan was secured by a Deed of Trust to real

property and a Preferred Ship Mortgage on the vessel "Captain Buddy."  *Id.* at 4 ¶¶ 16, 19.  LNV

also named as defendants the guarantors of the loan: Harrison's Country Inn and Sport Fishing

Center, Inc. ("HCI"); Levin F. Harrison, IV ("Harrison IV" or "Mr. Harrison"); Leslie A.

Harrison; the Estate of Levin F. Harrison, III ("Harrison III"); and the Estate of Roberta L.

Harrison ("Roberta Harrison").  *Id.* at 1.  Harrison III and Roberta Harrison are the deceased

parents of Harrison IV.  Leslie Harrison is the wife of Harrison IV.

The Complaint explained that the Maryland Commissioner of Financial Regulation

closed BOES in 2012, and the Federal Deposit Insurance Corporation ("FDIC") was appointed

---

[1] LNV is incorporated in Nevada and has its principal place of business in Texas.  ECF 17 at 3, Amended Complaint.  Jurisdiction is founded on diversity of citizenship.  *See* 28 U.S.C. § 1332.

as Receiver for BOES.  ECF 1 at 6 ¶¶ 21-22, Complaint.  In August 2014, the FDIC, as Receiver for BOES, assigned to LNV its interest in the Term Loan, effective May 2014.  *See* ECF 1-8, Assignment of Deed of Trust for Term Loan.

Harrison IV and Leslie Harrison moved to dismiss.  ECF 7.  HCI, Harrison III, and Roberta Harrison filed an answer and a counterclaim on December 22, 2014.  ECF 6, Answer/Counterclaim.  In the Counterclaim, they alleged that BOES had a "duty to act . . . as a reasonable lending institution," *id.* at 17 ¶ 33, and breached its duty by advising defendants "to incur ill-advised financial obligations, by not exercising due diligence during the loan administration process, and by employing improper loan administration and workout procedures by informing [HFB] that it could make interest only payments and late payments without consequence."  *Id.* at 17 ¶ 34.

According to the Counterclaim, "Levin F. Harrison, III; Roberta L. Harrison; and Levin F. Harrison, IV turned to [BOES] for most of their financial needs and advice."  *Id.* at 13 ¶ 12. Between 2003 and 2009, BOES, through its President, Sonny Robbins, made loans to the Harrisons and their businesses that totaled about $1,800,000, *id.* at 13-14, and BOES "required little to no documentation or financial records before electing to make the various loans."  *Id.* at 14 ¶ 14.  During the Fall of 2009, "[a]s a solution to [HFB's] cash flow issues, Mr. Robbins suggested that [HFB] consolidate all of the loans into one loan and take an additional sum of money to cover operational expenses until the 2011 summer season."  *Id.* at 14 ¶ 18.  The Counterclaim further alleged: "Mr. Robbins told Levin F. Harrison, III and Levin F. Harrison, IV that [HFB] could make interest only payments until the summer of 2011 without consequence."  *Id.* at 15 ¶ 23.  In addition, the Counterclaim alleged that, "pursuant to a verbal understanding with [BOES]," *id.* at 16 ¶ 25, "[f]rom 2010 until 2012, [HFB] was routinely late on its monthly

payments and made interest only payments during the fall and winter months without consequence. [BOES] led [HFB] to believe that late payments would be accepted and that it would be allowed to catch up in its payment arrears without consequence." *Id.* at 16 ¶ 26.

In its First Amended Complaint, filed on January 8, 2015 (ECF 17, Amended Complaint), LNV added allegations that HFB had also defaulted on a second commercial loan, in the amount of $100,000 ("Revolving Loan"), which HFB had also obtained from BOES in February 2010. *Id.* at 5 ¶ 22. As with the Term Loan, the Revolving Loan was secured by a Deed of Trust to real property and the Preferred Ship Mortgage on Captain Buddy. *See id.* at 5-7. In August 2014, the FDIC, as Receiver for BOES, assigned to LNV its interest in the Revolving Loan, effective May 2014. *See* LNV Exhibit D, Assignment of Deed of Trust for HFB Revolving Loan. [2]

LNV's Amended Complaint sets forth six counts. Counts I and II allege that HFB breached the loan agreements by failing to make payments when due. ECF 17 at 10-11, Amended Complaint. Both counts also seek a confessed judgment against HFB. [3] Counts III and IV allege breach of contract by the guarantors as to each loan. *Id.* at 13-16. Count V seeks the appointment of a receiver for HFB and Captain Buddy. *Id.* at 16-17. Count VI seeks injunctive relief against HFB and its members, directing them, *inter alia*, to transfer funds to the receiver and to cooperate with the receiver, and to enjoin them from transferring assets and revenue of

---

[2] At the motions hearing held on September 3, 2015, LNV introduced many exhibits, some of which were previously appended to pleadings, and thus also available on CM/ECF. Where possible, I will cite to ECF number. LNV's Exhibits D through M are not docketed on CM/ECF, however.

[3] On September 28, 2015, LNV requested entry of confessed judgments against HFB as to both the Term Loan and the Revolving Loan. ECF 70, Request for Entry of Confessed Judgment.

HFB without the receiver's consent.  *Id.* at 17-19.[4]  Numerous exhibits were appended to LNV's Amended Complaint.

On January 26, 2015, all defendants answered LNV's Amended Complaint.  ECF 32, Answer.  Notably, defendants did not refile their Counterclaim.  The Answer provides, in part: "Defendants admit that [HFB] has failed to make 15 consecutive scheduled payments on the Term Note, and 16 consecutive scheduled payments on the Revolving Loan Note," *id.* at 7 ¶ 37, but "deny that [the debt] was to be repaid pursuant to the terms and conditions of the Term Loan. . . ."  *Id.* at 6 ¶ 29.  Defendants maintained that BOES "represented that it would make accommodations for the repayment of the Term Loan, such as switching the payments to interest only during the winter months when Harrison's Country Inn was not generating income."  *Id.*  Defendants also asserted that BOES "was negligent in its loan administration of the Loans."  *Id.* at 7 ¶ 37.

Defendants' Answer also contains ten affirmative defenses, of which eight are pertinent here: (1) LNV "fails to state a claim upon which relief can be granted . . ."; (2)  "Plaintiff's claims for equitable relief are barred, in whole or in part, by the doctrine of unclean hands"; (3) "Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel"; (4) "Plaintiff's claims are barred in whole or in part by the act and/or omissions of Plaintiff and its predecessors"; (5) "Plaintiff's claims are barred by payment"; (6) "Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver"; (7) "Plaintiff's claims are barred by setoff and recoupment"; (8) "Plaintiff's claims are barred because the Bank of the Eastern Shore was negligent in the loan administration of the Term Loan."  *Id.* at 13-14.

---

[4] Following a motions hearing on September 3, 2015, the Court approved appointment of a Receiver for HFB.  *See* ECF 67; ECF 68.

On March 16, 2015, pursuant to Fed. R. Civ. P. 12(f), LNV filed a Motion to Strike Defendants' Affirmative Defenses (ECF 41, "Motion to Strike"), supported by a memorandum of law (ECF 41-1,"Memo") (collectively, "Motion to Strike" or "Motion").  In the Motion, LNV seeks to strike defendants' fourth, fifth, and eighth affirmative defenses.  Defendants oppose LNV's Motion to Strike as to defendants' fourth and eighth affirmative defenses, but concede as to the fifth affirmative defense.  *See* ECF 45 ("Opposition"); ECF 45-1 ("Opposition Memo") (collectively "Opposition").  LNV has replied (ECF 50, "Reply").

The Motion to Strike has been fully briefed.  In addition, on September 3, 2015, I held a motions hearing as to the pending Motion (ECF 41) and plaintiff's motion for appointment of a receiver as to HFB (ECF 3).[5]  I also granted the parties an opportunity to supplement their submissions as to whether and when defendants received notice that BOES had come under FDIC receivership.  Both sides responded.  *See* ECF 65, LNV's Letter dated Sept. 9, 2015, and accompanying exhibits; ECF 66, Defendants' Letter dated Sept. 10, 2015.  For the reasons that follow, I will grant the Motion to Strike.

## I.      Factual Background[6]

Since 1898, the Harrisons have operated hospitality, dining, and fishing businesses in Tilghman, Maryland.  *See* ECF 8-2 ¶ 3, Declaration of Levin F. Harrison, IV ("Decl. of Harrison IV").  During the early 1930s, Levin F. Harrison, Jr., purchased the property and the building that the Harrison family continues to operate as Harrison's Country Inn (the "Inn").  ECF 8-2 ¶

---

[5] As noted, I have already ruled on the motion for appointment of a receiver.  *See* ECF 67; ECF 68.

[6] In the factual summary, I rely on my notes of testimony adduced at the hearing held on September 3, 2015.  Unfortunately, I do not have a transcript of the proceedings and therefore I cannot provide citations.  In addition, I have drawn on and incorporate herein the factual summary set forth in my Memorandum Opinion of September 18, 2015 (ECF 67), addressing LNV's motion for appointment of a receiver as to HFB.

11, Decl. of Harrison IV.  Harrison III and his wife, Roberta Harrison, inherited the Inn during the late 1970s.

During the eighty years in which the Harrison family has owned the Inn, it has undergone various improvements.  According to Mr. Harrison, the Inn includes more than forty rooms for overnight guests, a restaurant and bar that can accommodate about one hundred patrons, a small gift shop, and a marina with slips from which customers can charter fishing cruises on the Captain Buddy and other vessels owned by independent contractors.

In May 1983, the Harrisons formed HCI, an S-Corporation, which "operates [the] family's country inn, restaurant, and charter fishing facility. . . ."  ECF 8-2 ¶ 3, Decl. of Harrison IV; *see* LNV Exhibit K, 2014 U.S. Income Tax Return for an S Corporation, Form 1120S, Harrison's Country Inn & Sportfishing Center, Inc.  In February 2010, HCI's shareholders were Harrison III, who owned 33.34% of HCI's stock; Roberta Harrison, who owned 33.33% of HCI's stock; and Harrison IV, who owned 33.33% of HCI's stock.  ECF 8-2 ¶ 4, Decl. Harrison IV.

The Harrisons "formed" HFB in early 2003, "to own, operate and manage real estate" to which the Harrison family already held title and which the Harrisons anticipated using as collateral to obtain financing.  ECF 8-2 ¶ 5, Decl. of Harrison IV; *see also* ECF 8-2 ¶ 5, Decl. of Harrison IV; LNV Exhibit F, 2014 Return of Partnership Income, Form 1065, Harrison Family Business, LLC (listing HFB's principal business activity as "investment" and its principal product or service as "real estate").

Upon creation of HFB, Harrison III and Roberta Harrison each held a fifty percent membership interest in HFB.  ECF 8-2 ¶ 5, Decl. of Harrison IV.  Apparently sometime between January 1, 2003, and February 16, 2010, Harrison III and Roberta Harrison transferred three

properties to HFB: the Inn and two smaller properties in Talbot County, Maryland.  *See* ECF 8-2 ¶ 5, Decl. of Harrison IV.[7]  Harrison IV is currently HFB's managing agent.

Testimony at the motions hearing suggested that, prior to February 2010, the total Harrison family debt amounted to about $2,500,000, inclusive of personal debt.  During the Fall of 2009, Harrison III, Roberta Harrison, and Harrison IV entered into discussions with BOES to consolidate and refinance their existing loans and to borrow an additional $200,000.  *See* ECF 8-2 ¶ 9, Decl. of Harrison IV.  Defense counsel maintained at the motions hearing that BOES induced the Harrisons to take out loans.

On February 16, 2010, BOES extended two commercial loans to HFB.  The first loan is the Term Loan for $2,600,000.  *See* ECF 17-1, Promissory Note Secured by Deed of Trust; *see also* ECF 17 at 3, Amended Complaint.  The second loan is the Revolving Loan for $100,000.  ECF 17-5, Bank of Eastern Shore Revolving Loan Note.  Each loan is secured by a Deed of Trust.  ECF 17-2, Deed of Trust for HFB Term Loan; ECF 17-7, Deed of Trust for HFB Revolving Loan.  Each Deed of Trust identified three parcels, including the Inn that Harrison III and Roberta Harrison had transferred to HFB.  ECF 17-2 at 17-18, Deed of Trust for HFB Term Loan, Exhibit A; ECF 17-7 at 18-19, Deed of Trust for HFB Revolving Loan, Exhibit A; *see also* ECF 8-2 ¶ 5, Decl. of Harrison IV; ECF 17 at 3-4, Amended Complaint.

Harrison III, Roberta Harrison, Harrison IV, Leslie Harrison, and HCI executed guaranty agreements for each loan.  ECF 17-4, Guaranty for Term Loan (signed individually by Harrison III, Roberta Harrison, Harrison IV, and Leslie Harrison); ECF 17-5, Guaranty for Term Loan (on behalf of HCI, signed by Harrison IV, Harrison III, and Roberta Harrison as HCI's officers);

---

[7] The properties are located at 21544 Chesapeake House Drive, Tilghman, Maryland 21671; 21415 Main Street, Tilghman, Maryland 21671; and Lot 1, 0.878 Acres, E/S Main Street, Tilghman, Maryland 21671.  ECF 17-2 at 17-18, Deed of Trust for HFB Term Loan, Exhibit A.

ECF 17-8, Guaranty for Revolving Loan (signed individually by Harrison III, Roberta Harrison, Harrison IV, and Leslie Harrison); ECF 17-9, Guaranty for Revolving Loan (on behalf of HCI, signed by Harrison IV, Harrison III, and Roberta Harrison as HCI's officers). Harrison III and Harrison IV also provided BOES with a Preferred Ship Mortgage as to the vessel "Captain Buddy." ECF 17-11, Preferred Ship Mortgage.

On September 15, 2011, BOES, HFB, and the loans' guarantors executed a loan modification. Among other things, it reduced the loans' interest rates and extended HFB's repayment schedule. ECF 17-12, Modification to Promissory Notes and Loan Documents.

Defendants maintain that, on some unspecified date, although presumably after HFB and BOES executed the loan modification, BOES orally agreed to alter the terms of the loan agreements. Mr. Harrison testified that he and Harrison III had made numerous trips to BOES to discuss modifying the terms of the loans. Defendants assert: "Bank of the Eastern Shore represented that it would make accommodations for the repayment of the Term Loan, such as switching the payments to interest only during the winter months when Harrison's Country Inn was not generating business." ECF 32 at 6, Answer. At the hearing, defendants conceded that their alleged agreement with BOES was never reduced to writing.

As noted, on April 27, 2012, the Maryland Commissioner of Financial Regulation closed BOES (ECF 17 at 8, Amended Complaint) and the FDIC was appointed BOES's Receiver. *Id.* On August 20, 2014, the FDIC, as BOES's Receiver, assigned to LNV the deeds of trust that HFB had executed to secure its loans from BOES. ECF 17-13, Assignment of Deed of Trust; ECF 17-14, Assignment of Deed of Trust. LNV recorded the assignments in the land records of Talbot County, Maryland. *Id.*

In 2013, HFB began to miss payments due on the loans.  ECF 17 at 9, Amended Complaint; ECF 32 at 7-8, Answer.  At the hearing, Mr. Harrison conceded that HFB has not made payments on either loan in over a year.  On November 13, 2014, LNV, as BOES's successor in interest, demanded that HFB and the loans' guarantors bring the notes current.  ECF 17-15, Letter from LNV's Counsel to Defendants dated Nov. 13, 2014; ECF 17-16, Letter from LNV's Counsel to Defendants, dated Nov. 13, 2014.  When HFB failed to do so, LNV filed suit.

## II.   Discussion

### A. Introduction

As noted, plaintiff has moved to strike the fourth, fifth, and eighth affirmative defenses. LNV argues first that this Court lacks subject matter jurisdiction as to any claim based on the conduct of BOES or the FDIC because defendants "did not avail themselves of the administrative remedies" provided by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").  *See* ECF 41-1 at 2-3, Motion to Strike; 12 U.S.C. § 1821(d)(13)(D).  Second, plaintiff argues:  "The common law *D'Oench Dhume* doctrine prevents parties from asserting any 'claim' . . . against the FDIC or its successors and assigns based on any written agreements reached with a failed bank."  ECF 41-1 at 3, Motion to Strike.  Third, plaintiff contends that defendants "waived their right to assert any claims against [BOES] related to the loans when they executed the Loan Modification in September 2011," as to any conduct prior to that date.  *Id.*  Fourth, plaintiff contends that defendants' reliance on alleged unwritten agreements is barred by the Maryland statute of frauds.  *Id.*

In their Opposition, defendants did not address plaintiff's Motion to Strike defendants' fifth affirmative defense of payment.  As LNV notes (ECF 41-1 at 6, Motion to Strike), defendants' fifth affirmative defense—that "Plaintiff's claims are barred by payment" (ECF 32 at

13, Answer)—contradicts defendants' admission that HFB has not made a payment on either loan in more than a year.   At the motions hearing held on September 3, 2015, defendants represented that they do not oppose LNV's motion to strike their fifth affirmative defense. Therefore, I will grant the Motion to Strike defendants' fifth affirmative defense.

## B.  Standard of Review under Fed. R. Civ. P. 12(f)

Under Fed. R. Civ. P. 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."   Nevertheless, "Rule 12(f) motions are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic."  *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (internal citations and quotations omitted).

"When reviewing a motion to strike, 'the court must view the pleading under attack in a light most favorable to the pleader.'"  *Piontek v. Serv. Ctrs. Corp.*, PJM-10-01202, 2010 WL 4449419, at *3 (D. Md. Nov. 5, 2010) (citation omitted).  And, the facts set forth in a defendant's answer must be taken as true.  *Kelly v. Kosuga*, 358 U.S. 516, 516 (1959) ("A motion was made to strike this defense and therefore the facts underlying it must be taken to be those set up in the petitioner's answer."); *see also, e.g.*, 5C Wright & Miller, Federal Practice & Procedure § 1380, 406 (3d ed. 2004 & Supp. 2014).

Moreover, courts are generally not inclined to employ the "drastic remedy," *Waste Mgmt. Holdings*, 252 F.3d at 347, of striking defenses unless the movant can "demonstrate that [it] will be prejudiced if the defense is not stricken."  *Miller v. Live Nation Worldwide, Inc.*, TDC-14-02697, 2015 WL 235553, at *3 (D. Md. Jan. 15, 2015).  *See also Haley Paint Co. v. E.I. Du Pont De Nemours & Co.*, 279 F.R.D. 331, 337 (D. Md. 2012); *Certain Underwriters at Lloyd's,*

*London v. R.J. Wilson & Associates, Ltd.*, CCB-11-01809, 2012 WL 2945489, at *5 (D. Md. July 17, 2012) ("[T]he court is disinclined to use its discretion to strike or limit defendants' affirmative defenses in the absence of clear and undue prejudice.").  Of import here, a movant can demonstrate prejudice by showing that, for example, inclusion of the defense will affect the scope of discovery.  *See, e.g., Villa v. Ally Fin., Inc.*, 1:13CV953, 2014 WL 800450, at *1 (M.D.N.C. Feb. 28, 2014) ("[T]he moving party must show prejudice: for instance, where an irrelevant affirmative defense results in increased time and expense of trial, including the possibility of extensive and burdensome discovery.") (citations and alterations in original omitted) (alteration added by this Court); *E.E.O.C. v. Spoa, LLC*, CCB-13-01615, 2014 WL 47337, at *3 (D. Md. Jan. 3, 2014) ("[T]he EEOC cannot claim prejudice when it has been given early notice of the affirmative defenses and when the defenses will not in any significant way affect the scope of discovery.").

To date, neither the Supreme Court nor the Fourth Circuit has indicated whether the heightened pleading standard of *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), applies to affirmative defenses.  *Cf. Walters v. Performant Recovery, Inc.*, 14-CV-01977 (VLB), 2015 WL 4999796, at *1 (D. Conn. Aug. 21, 2015) ("[T]here is much disagreement among courts … regarding the standards under which … motions [to strike] are to be resolved.").  However, several judges in this District have determined that *Twombly* and *Iqbal* are applicable to the pleading of affirmative defenses.  *See, e.g., Alston v. Equifax Information Services, LLC*, GLR-13-00934, 2014 WL 580148, at *2 (D. Md. Feb. 11, 2014) (Russell, J.); *Blind Indus. and Servs. of Md. v. Route 40 Paintball Park*, WMN-11-03562, 2012 WL 2946688, at *3 (D. Md. July 17, 2012) (Gallagher, M.J.); *Aguilar v. City Lights of China Restaurant, Inc.*, DKC-11-02416, 2011 WL 5118325, at *1-4 (D. Md. Oct. 24, 2011) (Chasanow, J.); *Bradshaw v.*

*Hilco Receivables, LLC*, 725 F. Supp. 2d 532, 536-37 (D. Md. 2010) (Bennett, J.); *Topline Solutions, Inc. v. Sandler Sys., Inc.*, L-09-03102, 2010 WL 2998836, at *1 (D. Md. July 27, 2010) (Legg, J.).  Other judges in this District have concluded that *Twombly* and *Iqbal* are not clearly applicable in considering a motion to strike, based on differences in the language of Fed. R. Civ. P. 8(a), which applies to claims for relief, and Rule 8 subsections (b) and (c), which apply to defenses and affirmative defenses, respectively.  *See*, *e.g.*, *LBCMT 2007-C3 Urbana Pike, LLC v. Sheppard*, 302 F.R.D. 385, 387 (D. Md. 2014) (Bredar, J.) (declining to apply *Twombly* and *Iqbal* standard; *Lockheed Martin Corp. v. United States*, 973 F. Supp. 2d 591, 593 (D. Md. 2013) (Williams, J.); *Gardner v. Montgomery Cnty. Teachers Fed. Credit Union*, JFM-10-02781 (D. Md. Jan. 7, 2011) (ECF No. 11).

To be sure, there are differences in the language of Rule 8(a), Rule 8(b), and Rule 8(c), arguably suggesting that the plausibility standard is inapplicable to affirmative defenses. For example, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," while Rule 8(b)(1)(A) merely requires a party to "state in short and plain terms its defenses to each claim." Nor does Rule 8(c) mention a factual showing. Nevertheless, what the court said in *Palmer v. Oakland Farms, Inc.*, 5:10CV00029, 2010 WL 2605179, at *4 (W.D. Va. June 24, 2010), resonates here:

> On its face, the argument accepted by the majority of courts extending the "plausibility" pleading standard of *Twombly* and *Iqbal* to defensive pleadings is compelling. As the plaintiff argues, it neither makes sense nor is it fair to require a plaintiff to provide the defendant with enough notice that there is a plausible, factual basis for her claim under one pleading standard and then permit the defendant under another pleading standard simply to suggest that some defense may possibly apply in the case.

Indeed, "it would be incongruous and unfair to require a plaintiff to operate under one standard and to permit the defendant to operate under a different, less stringent standard." *Topline Solutions, Inc.*, 2010 WL 2998836, at *1.  Moreover, "[b]oilerplate defenses clutter the

docket and, further, create unnecessary work. . . . Rule 15 allows for appropriate amendments and counsel should therefore feel no need . . . to window-dress pleadings early for fear of losing defenses later." *Safeco Ins. Co. of Am. v. O'Hara Corp.*, 08-CV-10545, 2008 WL 2558015, at *1 (E.D. Mich. June 25, 2008).

In any event, the heightened pleading standard does not require the assertion of all supporting evidentiary facts. *See Palmer*, 2010 WL 2605179, at *5. "At a minimum, however, some statement of the ultimate facts underlying the defense must be set forth, and both its non-conclusory factual content and the reasonable inferences from that content, must plausibly suggest a cognizable defense available to the defendant." *Id.*

In this case, whether or not the *Twombly/Iqbal* standard applies to the affirmative defenses, defendants cannot pursue their fourth and eighth affirmative defenses, for the reasons discussed below.

## C.  FIRREA

As noted, LNV argues that "[t]his Court lacks subject matter jurisdiction" over defendants' fourth and eighth affirmative defenses.  ECF 41-1 at 6, Motion; *see* ECF 50 at 4-5, Reply.  LNV contends that, under the FIRREA, "any 'claim,' whether pleaded as a counterclaim or an affirmative defense, that stems in any manner from the conduct of the Bank" must be raised first in "an administrative claim with the FDIC."  ECF 41-1 at 6, Motion.  According to LNV, defendants failed to exhaust their administrative remedies, and therefore, defendants are barred from raising their fourth and eighth affirmative defenses here.  *Id.*

Defendants counter that the affirmative defenses in issue do not constitute claims under FIRREA.  Therefore, they maintain that they were not required to proceed administratively. ECF 45-1 at 6, Opposition.

Congress enacted FIRREA (codified in Title 12 of the United States Code) in response to the savings and loan crisis of the 1980s. *See Sharpe v. FDIC,* 126 F.3d 1147, 1154 (9th Cir. 1997). "The statute's purpose was to 'provide funds from public and private sources to deal expeditiously' with faltering and failed savings and loans in order to rebuild their financial foundations." *Brady Dev. Co. v. Resolution Trust Corp.*, 14 F.3d 998, 1002-03 (4th Cir. 1994) (quoting Pub. L. No. 101–73, 103 Stat. 183, § 101). Under FIRREA, the FDIC may "act as receiver or conservator of a failed institution for the protection of depositors and creditors." *Id.*

In addition, "FIRREA provides an administrative scheme for adjudicating claims against failed institutions for which the FDIC has become receiver." *F.D.I.C. v. Martini*, CIV 94-1932, 1995 WL 168139, at *2 (D. Md. Apr. 5, 1995) (citing *Brady Dev. Co.*, 14 F.3d at 1002). In *Tillman v. Resolution Trust Corp.*, 37 F.3d 1032, 1035 (4th Cir. 1994), the Fourth Circuit described the administrative process that a claimant must pursue:

> [U]nder 12 U.S.C. § 1821(d), a claimant must present his claim to the receiver for an initial determination of whether the claim should be allowed within 90 days of the publication of notice by the receiver. 12 U.S.C. § 1821(d)(3). The receiver has 180 days after the claim is filed to determine whether to approve the claim. 12 U.S.C. § 1821(d)(5)(A)(i). After the receiver's initial decision, or if the receiver makes no decision within the 180-day period, a claimant may file a suit on the claim in one of two designated federal courts, within 60 days of the earlier of (a) the end of the 180–day period in which the receiver may determine the claim, or (b) the date of notice from the receiver that the claim has been disallowed. 12 U.S.C. § 1821(d)(6)(A). The receiver's final determination is subject to *de novo* judicial review. 12 U.S.C. § 1821(d)(7)(A).

"To effectuate its goals of managing claims in an expeditious and efficient manner through an administrative process, Congress placed jurisdictional limits on the power of the federal courts to review matters involving failed savings and loans under FIRREA." *Brady Dev. Co.*, 14 F.3d at 1003. In relevant part, FIRREA provides, 12 U.S.C. § 1821(d)(13)(D):

> Limitation on judicial review

Except as otherwise provided in this subsection, no court shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

The Fourth Circuit has observed, *Brady Dev. Co.*, 14 F.3d at 1003, that:

The precise jurisdictional limitations on the Article III courts mandated by FIRREA are determined by reading section 1821(d)(13)(D) in conjunction with the statute's allowance of an action within sixty days of a claim being denied as provided for in section 1821(d)(6)(A). Together these provisions mandate that the district court not hear any claim until it has been rejected by the [Resolution Trust Corporation] in its administrative review or until the 180 day administrative review period has expired.

Notably, a party's "failure to exhaust the administrative process" to settle claims under FIRREA "deprives the district court of jurisdiction." *Id.* at 1006; *see also F.D.I.C. v. Abbott*, No. CCB-12-2111, 2013 WL 4924495, at *4-5 (D. Md. Sept. 11, 2013) (dismissing counterclaims that defendant had failed to exhaust through the FIRREA's administrative procedure).

At the motions hearing, the Court raised the issue of whether and when defendants had received notice that BOES had come under FDIC receivership and permitted supplemental submissions on this issue. LNV's supplemental briefing demonstrates that HFB had timely notice of the FDIC's receivership over BOES. ECF 65-1 at 2, Borrower Notification Letter dated Apr. 29, 2012. Indeed, "Defendants do not dispute notice of the receivership of . . . [BOES]." ECF 66 at 1, Defendants' Letter to the Court dated Sept. 10, 2015.

Moreover, defendants do not dispute that FIRREA requires exhaustion of its administrative procedure with respect to claims against failed financial institutions under FDIC receivership. And, defendants do not contend that they pursued claims through FIRREA's

administrative claims review procedure.  Rather, defendants maintain that their fourth and eighth

"affirmative defenses" are not "claims" that must proceed through FIRREA's administrative

procedure.  45-1 at 6, Opposition.

I am unaware of guidance from the Supreme Court or the Fourth Circuit on whether an

"affirmative defense" constitutes a "claim" for purposes of FIRREA's administrative procedure.

But, at least five federal circuit courts have considered the issue and have held that an

"affirmative defense" does not constitute a "claim" that requires exhaustion of FIRREA's

administrative procedure.  *Am. First Fed., Inc. v. Lake Forest Park, Inc.*, 198 F.3d 1259, 1264

(11th Cir. 1999); *Bolduc v. Beal Bank, SSB*, 167 F.3d 667, 671-72 (1st Cir. 1999); *Tri-State*

*Hotels, Inc. v. F.D.I.C.*, 79 F.3d 707, 715 (8th Cir. 1996); *Nat'l Union Fire Ins. Co. of*

*Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 393 (3d Cir. 1994); *Resolution Trust Corp. v.*

*Midwest Fed. Sav. Bank of Minot*, 36 F.3d 785, 793 (9th Cir. 1993).

Merely styling a claim as an "affirmative defense," however, does not exempt the claim

from FIRREA's administrative procedure.  The Eleventh Circuit has observed, *Am. First Fed.,*

*Inc.*, 198 F.3d at 1264-65:

> [A] court must look beyond the nomenclature of a request for relief to ascertain
> whether it is a true affirmative defense or is, in actuality, a claim requiring
> exhaustion as a prerequisite to jurisdiction. Whether a request for relief is titled an
> affirmative defense or a counterclaim is not dispositive to the question of subject
> matter jurisdiction. The germane question is whether the remedy sought by a
> party, regardless of its label, is encompassed by Section 1821(d)(13)(D).

Defendants maintain that their fourth and eighth affirmative defenses are "pure

affirmative defenses," in that "Defendants are not seeking independent relief from the Court or

requesting payment from Plaintiff."  ECF 45-1 at 6, Opposition.  They rely on *Nat'l Union Fire*

*Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376 (3d Cir. 1994).  *See* ECF 45-1 at 5-6.

In that case, the Third Circuit determined, based on the Bankruptcy Code, that a claim constitutes

-16-

"an action asserting a right to payment." *Id.* at 393 (citation and quotation marks omitted). Drawing on Black's Law Dictionary, the Third Circuit concluded that "a defense or an affirmative defense is neither an 'action' nor a 'claim,' but rather is a *response* to an action or a claim, and that therefore defenses and affirmative defenses do not fall" within the ambit of FIRREA's administrative procedure. *Id.* (emphasis in original).

Other courts, however, disagree with the Third Circuit's distinction between claims and affirmative defenses. For example, in *Rundgren v. Washington Mut. Bank, FA*, 760 F.3d 1056, 1064 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 1560 (2015), the Ninth Circuit said:

> [A] claim aimed at preventing a lender from obtaining repayment of a loan or any realization on its security interest is clearly a claim against the lender that seeks "a determination of rights with respect to a bank asset" for purposes of § 1821(d)(13)(D)(i). Moreover, a borrower's claim that the bank is not entitled to foreclose due to past misdeeds plainly satisfies the criterion of being a "claim relating to any act or omission" of a bank.

Two decades before *Rundgren*, 760 F.3d 1056, a court in this District, *Martini*, 1995 WL 168139, reached a similar conclusion. In *Martini*, 1995 WL 168139, the court considered whether it had subject matter jurisdiction over an Equal Credit Opportunity Act challenge to a loan guaranty that the defendant had styled as an affirmative defense in a suit by the FDIC. *Id.* at *1. Consistent with the later reasoning of *Rundgren*, 760 F.3d at 1064, *Martini* concluded that the defendant's "affirmative defense" constituted a claim that required exhaustion of FIRREA's administrative process because it was "an attempt to limit or totally defeat the FDIC's right to enforce the Guaranty." *Martini*, 1995 WL 168139, at *3. The court reasoned: "[T]he fact [that defendant's] . . . allegation is framed as an 'affirmative defense' . . . does not change the fact that [defendant] could have affirmatively asserted the alleged [Equal Credit Opportunity Act] violation in her own action against the FDIC." *Id.*

I agree with the reasoning of *Rundgren*, 760 F.3d 1056, and *Martini*, 1995 WL 168139. "[A] claim aimed at preventing a lender from obtaining repayment of a loan or any realization on its security interest is clearly a claim against the lender" and therefore it requires exhaustion of FIRREA's administrative procedure. *Rundgren*, 760 F.3d at 1064. To hold otherwise would defeat Congress's "goals of managing claims in an expeditious and efficient manner through an administrative process." *Brady Dev. Co.*, 14 F.3d at 1003. It would exalt form over substance by permitting litigants to style as "affirmative defenses" claims "relating to any act or omission" by an institution under FDIC receivership, 12 U.S.C. § 1821(d)(13)(D)(ii), so as to escape FIRREA's administrative procedure.

Yet, this is precisely what defendants have attempted. As noted by LNV, in response to the original Complaint (ECF 1), defendants HCI, Harrison III, and Roberta Harrison simultaneously answered and filed a counterclaim against LNV, as BOES's successor in interest, for negligence by BOES in "advising [defendants] to incur ill-advised financial obligations, by not exercising due diligence during the loan administration process, and by employing improper loan administration and workout procedures by informing [HFB] that it could make interest only payments and late payments without consequence." ECF 6 at 17, Answer. And, all the defendants filed an Answer to LNV's Amended Complaint, in which they made the same assertions cast as affirmative defenses. Defendants' fourth affirmative defense provides: "Plaintiff's claims are barred in whole or in part by the act and/or omissions of Plaintiff and its predecessors." ECF 32 at 14, Answer. In defendants' eighth affirmative defense, they maintain: "Plaintiff's claims are barred because the Bank of the Eastern Shore was negligent in the loan administration of the Term Loan." *Id.* Particularly in light of the argument of defense counsel at the motions hearing, coupled with Mr. Harrison's testimony at the hearing, to the effect that

BOES is at fault for having made the loans to HFB, it is apparent that defendants' fourth and eight affirmative defenses are, in substance, repackaged counterclaims.

Whatever the merits of defendants' contention that BOES was negligent in extending the loans to HFB, this claim should have been raised through the administrative process that FIRREA established.   Therefore, I agree with LNV that this Court lacks jurisdiction over defendants' fourth and eighth affirmative defenses.

### D.  *D'Oench, Duhme* Doctrine

Alternatively, LNV argues that defendants' fourth and eighth affirmative defenses are barred by the *D'Oench, Duhme* doctrine.   ECF 41-1 at 9, Motion to Strike; ECF 50 at 7-9, Reply. Defendants counter that "striking Defendants' Fourth and Eighth Defenses is premature," ECF 45-1 at 6, Opposition, and that discovery "may indicate an implied agreement if, the records in fact reflect the Borrower made interest only payments during the offseason for two years without consequence and that late payments were routinely accepted without consequence." *Id.* at 6-7. Defendants further assert: "Defendants' Fourth and Eighth Defenses do not rest exclusively on an oral agreement between the Borrower and the Bank of the Eastern Shore.   Rather, Defendants' defenses broadly include the making of the Loans and improper loan administration." *Id.* at 7.

The *D'Oench, Duhme* doctrine takes its name from the Supreme Court's decision in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942).   That case involved a promissory note, originally held by a bank, that was acquired by the FDIC "in connection with the assumption of the [original bank's] deposit liabilities by another bank." *Id.* at 454.   When the FDIC sued to collect on the note, the maker of the note contended that it had "sold the [original] bank certain bonds which later defaulted," and that the promissory note had been "executed to enable the

bank to carry the note[ ] and not show any past due bonds" on its books. *Id.* Thus, the receipt for the note contained an alleged proviso: "'This note is given with the understanding it will not be called for payment.'" *Id.* at 454 (quoting receipt).

The Supreme Court determined that the purported agreement that the promissory note would not be repaid was unenforceable against the FDIC, pursuant to "a general policy" of federal common law "to protect the institution of banking from such secret agreements." *Id.* at 458. It said: "'Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in the form of a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.'" *Id* . at 459 (citation omitted). In the Supreme Court's view, "[p]lainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners." *Id.* at 460.

In *Young v. FDIC,* 103 F.3d 1180 (4th Cir.), *cert. denied,* 522 U.S. 928 (1997), the Fourth Circuit described the contours of the *D'Oench, Duhme* doctrine as it has subsequently developed. It said, *id.* at 1187 (some internal citations omitted):

> The *D'Oench* doctrine . . . "prohibits claims based upon agreements which are not properly reflected in the official books or records of a failed bank or thrift." *Resolution Trust Corp. v. Allen,* 16 F.3d 568, 574 (4th Cir. 1994). The doctrine serves two purposes. First, it allows federal and state examiners to rely on a bank's records in evaluating the institution's fiscal soundness. *Id.* at 574. Second, it "ensure[s] mature consideration of unusual loan transactions by senior bank officials, and prevent[s] fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." *Langley v. FDIC,* 484 U.S. 86, 92, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).

> The original test for determining whether claims were barred under the *D'Oench* doctrine was whether the agreement, oral or written, either was designed to deceive the public authority or would tend to have that effect. Courts, however, have expanded the doctrine, and it now applies in virtually all cases where the

FDIC is confronted with an agreement not documented in the institution's records.

In the Federal Deposit Insurance Act of 1950, as amended by FIRREA, Congress "codified elements of the common law *D'Oench Duhme* doctrine in 12 U.S.C.A. §§ 1823(e) and 1821(d)(9) in order to protect taxpayers, depositors, and creditors of failed financial institutions and federal deposit insurance funds." *Resolution Trust Corp. v. Allen,* 16 F.3d 568, 574 (4th Cir. 1994). Section 1823(e) of 12 U.S.C. provides, with exceptions not relevant here:

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it . . . , either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (A) is in writing,
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

In addition, 12 U.S.C. § 1821(d)(9)(A) provides (with exceptions not relevant), that "any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation."

The Fourth Circuit has explained that § 1823(e) "essentially codifies the common law *D'Oench* doctrine," although "the two remain separate and independent grounds for decision." *Nat'l Enters., Inc. v. Barnes,* 201 F.3d 331, 333 n. 4 (4th Cir. 2000). Indeed, "the Fourth Circuit and other courts often construe the *D'Oench* doctrine and section 1823(e) in tandem." *Young,*

-21-

103 F.3d at 1187.  Here, LNV notes that the common law doctrine and its statutory counterparts

"'remain separate and independent grounds for decision,'" ECF 41-1 at 10 n.7 (quoting

*Goldstein v. F.D.I.C.*, No. CIV.A. ELH-11-1604, 2012 WL 1819284, at *5 (D. Md. May 16,

2012)), but does not contend that the common law doctrine and its statutory counterparts should

produce differing results.

The scope of the *D'Oench, Duhme* doctrine and its statutory counterparts is not altogether

clear.  In some decisions, the *D'Oench, Duhme* doctrine and its statutory counterparts are

described in terms akin to a statute of frauds, *i.e.,* prohibiting the enforcement of any agreement

that does not conform to the requirements of the doctrine.  *See, e.g., Nat'l Enters., Inc. v. Barnes,*

201 F.3d 331, 333 n. 3 (4th Cir. 2000) ("The *D'Oench* doctrine prohibits claims based upon

agreements which are not properly reflected in the official books or records of a failed bank or

thrift."); *Young,* 103 F.3d at 1187 (stating that *D'Oench, Duhme* "applies in virtually all cases

where the FDIC is confronted with an agreement not documented in the institution's records").

In other cases, however, *D'Oench* and § 1823(e) have been described in terms more akin

to a parol evidence rule, *i.e.,* prohibiting the use of an agreement that does not conform to the

requirements of the doctrine for the purpose of varying or contradicting the terms of another,

written agreement.  For instance, in *E.J. Sebastian Associates v. Resolution Trust Corp.,* 43 F.3d

106 (4th Cir. 1994), the Fourth Circuit "question[ed] the applicability of the *D'Oench* Doctrine"

in a circumstance where a claim was "based upon an oral agreement" with a failed bank that did

not "contradict any prior written contract between the parties." *Id.* at 109.  The Court said, *id.:*

> Cases applying the *D'Oench* Doctrine traditionally involve a claim based upon an
> oral side agreement which contradicts a written document. Typically, *D'Oench*
> arises to bar a claimant from disputing the enforcement of a written loan
> agreement based upon an oral agreement that the claimant professes to have
> entered into with a bank official. *D'Oench* declared that such oral agreements are

unenforceable; and therefore, the written loan agreement prevails . . . . [T]his case does not appear to present the traditional *D'Oench* Doctrine scenario.

Similarly, in a subsequent decision in this District, Judge Benson E. Legg stated: "The application of the [*D'Oench*] doctrine necessarily requires a conflict between the alleged side agreement and the written document; if the side agreement comports with the written document, *D'Oench* does not [prevent] its assertion against the banking authority." *Md. Nat'l Bank v. Resolution Trust Corp.*, 895 F. Supp. 762, 769 (D. Md. 1995) (citing *E.J. Sebastian and John v. Resolution Trust Corp.*, 39 F.3d 773 (7th Cir. 1994)).

Here, defendants concede that "*D'Oench* protects the FDIC from oral agreements that, for some reason, do not become part of the loan record." ECF 45-1 at 6, Opposition. However, defendants assert that discovery may yield "bank records," *id.* at 6, that "reflect [that HFB] made interest only payments during the offseason for two years without consequence and that late payments were routinely accepted without consequence." *Id.* at 7. These bank records, defendants maintain, "may indicate an implied agreement" between BOES and defendants. *Id.* 6-7. Furthermore, defendants contend that these bank records may illuminate BOES's negligence in "the making of the Loans and improper loan administration." *Id.* at 7.

LNV counters that "*D'Oench* flatly prohibits claims based on oral agreements - it does not permit parties to scour the failed bank's records for evidence that implies an oral agreement existed." ECF 50 at 8, Reply. LNV accuses defendants of attempting "to conduct a fishing expedition in discovery in support of a claim that is barred as a matter of law." *Id.*

I agree with LNV. Even assuming that defendants, in fact, had an agreement with BOES that modified HFB's obligation to timely repay the loans, defendants conceded at the hearing that such an agreement was oral or implied by course of conduct. An oral or implied agreement is precisely the type of agreement from which the *D'Oench, Duhme* doctrine and its statutory

counterparts, 12 U.S.C. §§ 1823(e) and 1821(d)(9), protect the FDIC, as receiver, and subsequent assignees, such as LNV.  Even if defendants could establish the existence of an oral or implied agreement modifying the loan documents, such agreements are barred as a matter of law.

Moreover, LNV is correct that it will be prejudiced by the extensive discovery into the records of a failed bank and the actions of its former officers that defendants' fourth and eighth affirmative defenses anticipate.  In light of the legal insufficiency of defendants' fourth and eighth affirmative defenses, defendants' likely scope of discovery would unduly prejudice LNV.

As indicated earlier, LNV also moved to strike defendants' fourth and eight affirmative defenses on the ground that defendants expressly waived claims related to the administration of the loans in a September 15, 2011, loan modification agreement.  ECF 41-1 at 11-12, Motion to Strike; *see* ECF 17-12 at 5, Modification to Promissory Notes and Loan Documents.   Further, LNV argues that defendants' fourth and eighth affirmative defenses are barred by Maryland's statute of frauds.  ECF 41-1 at 12-13, Motion to Strike.  In light of my conclusions as to other arguments advanced by LNV, I need not reach these issues.

### III.    Conclusion

For the foregoing reasons, I will grant LNV's Motion to Strike.

A separate Order follows, consistent with this Memorandum.


Date:   October 1, 2015                    _____/s/_____
                                           Ellen Lipton Hollander
                                           United States District Judge